# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARY ALICE CLARK, CHRISTOPHER COULTER, AARON PEREZ, KEVIN NELSON, and PHILLIP ROSCHER, on behalf of themselves, and on behalf of all others similarly situated, | |
| Plaintiffs, | Civil Action No. 1:22-cv-10236 |
| v. | |
| CAPITAL VISION SERVICES, LLC d/b/a MYEYEDR, | |
| Defendant. | |

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CERTIFICATION OF A CLASS UNDER FRCP 23

Plaintiffs' Motion for Class Certification ("Motion") (ECF No. 165) attempts to elevate limited information included in a form job description over record evidence that reflects substantial variation in the job duties and level of responsibility General Managers ("GMs") held. The widely varying testimony from GMs deposed in discovery, along with other substantial record evidence, reflects that GMs' duties and levels of discretion and authority varied widely and in ways that relate directly to their status as subject to the executive or administrative exemptions from overtime pay requirements that form the heart of this case. Those differences would require a person-by-person assessment of hundreds of individuals' duties and experiences in the GM role in order to assess their exempt status. Ironically, these inherent obstacles to Plaintiffs' bid to overcome their exempt status on a classwide basis are multiplied by Plaintiffs' decision to pursue multiple theories of liability that pose yet further individualized inquiries. Specifically, Plaintiffs' pending Motion for Summary Judgment (ECF No. 179) adds two inquires, in addition to a review of GMs' job duties, that are fundamentally individual and cannot be adjudicated in common: whether and to what extent each GM supervised two or more full-time subordinates, and whether and to what extent each GM was subject to a policy or practice that created a risk of improper deductions from his/her salary. In combination, this host of individualized issues leaves Plaintiffs no prospect of meeting their burden to demonstrate that their claims pose common questions susceptible to common, classwide answers, as the governing caselaw requires, and their Motion fails.

Plaintiffs' bid for class certification is also infected by the unscrupulous tactics the Shavitz Law Firm plied in recruiting Plaintiffs to join this action, intentionally misleading them to believe they were *joining* an action already underway, when Plaintiffs were in fact being enlisted to *commence* litigation designed to promote only the interests of Shavitz Law Group. Plaintiffs and their counsel thus cannot meet the adequacy of representation requirements of Rule 23.

## PROCEDURAL BACKGROUND

Plaintiffs initially filed this action claiming MyEyeDr. misclassified all GMs nationwide as exempt from the overtime pay requirements imposed by the federal Fair Labor Standards Act ("FLSA"). ECF No. 1. Subsequently, Plaintiffs amended their Complaint to add claims that Defendant misclassified General Managers-in-Training ("GMITs") and to add Rule 23 overtime claims under Massachusetts and Pennsylvania law. ECF No. 12. Plaintiffs later filed a Motion for Conditional Certification of their FLSA claims (ECF. No. 20), which the Court granted on July 22, 2022.[1] ECF. No. 42. The parties since engaged in extensive discovery, including depositions of four Named Plaintiffs, 24 Opt-In Plaintiffs, eight District Managers, and three of MyEyeDr.'s executives and payroll administrators. Following discovery, the parties filed cross-motions for summary judgment. ECF Nos. 166, 169, 172, 175, 179. Defendant moved for summary judgment on all claims by Plaintiffs Galba-Bright, ECF No. 166; Cardona, ECF No. 169; Clark, ECF No. 172; and Firouzi, ECF No. 175.[2] Plaintiffs moved for summary judgment on the exempt status of GMITs, the salary basis and supervision requirements of the exemptions, Plaintiffs' expected hours of work and associated compensation, and availability of liquidated damages. ECF No. 179. At the same time, Plaintiffs filed their Motion to certify two Rule 23 classes. ECF No. 165.

## ARGUMENT

### I.    LEGAL STANDARD

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

---

[1] Defendant intends to move to decertify the FLSA collective on or before March 29, 2024.

[2] Defendant moved as to Plaintiff Galba-Bright on the FLSA's executive exemption; Plaintiff Cardona on the FLSA's executive and administrative exemptions; Plaintiff Clark on the executive exemption and emergency exception, and "qualified trainee" exemption under Massachusetts law; and Plaintiff Firouzi on failure to establish a "willful" violation of the FLSA to extend the statute of limitations.

Plaintiffs must "affirmatively demonstrate" compliance with Rule 23. *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011)). The Court must conduct a "rigorous analysis," and Plaintiffs' failure renders certification improper. *Dukes*, 564 U.S. at 350-52.[3]

## II. SHAVITZ LAW GROUP MISLED THE NAMED PLAINTIFFS INTO COMMENCING THIS ACTION AND ARE NOT ADEQUATE REPRESENTATIVES OF THE CLASS

Shavitz Law Group ("SLG")[4] are not adequate representatives of any class because they solicited the Plaintiffs to initiate litigation for SLG's own benefit, deliberately obscuring the fact that the firm had no client to represent when it began trolling for plaintiffs. According to SLG, Eduardo Llorentis became their first "client" in July 2021, but he was not among the Named Plaintiffs who filed this action in February 2022, and only later joined as an Opt-in. (ECF No. 98-9). Llorentis testified at deposition that he first became involved when he received an unsolicited message on LinkedIn from SLG about an overtime lawsuit that was "going on." (ECF No. 98-10, Deposition of Eduardo Llorentis "Llorentis Tr." at 13-15). Thus, Llorentis was under the impression that he was not SLG's first client. *Id.*[5] Subsequently, SLG acknowledged in open court they knew their message to Llorentis would be confusing, and they knowingly allowed him to proceed based on a misunderstanding: "The thing with, lay people, your Honor, is they will refer

[3] The Rule 23 standard for class certification is more stringent than the FLSA's conditional certification standard. *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 183–84 (3rd Cir. 2019) ( "[R]eliance on, and application of, principles of conditional certification [for an FLSA collective action] in the Rule 23 context cannot be permitted."); *Monroe v. FTS USA, LLC*, 860 F.3d 389 (6th Cir. 2017) ("[T]he FLSA's 'similarly situated' standard is less demanding than Rule 23's standard.") (internal citation and quotation omitted).

[4] Defendant refers to Plaintiffs' counsel as "SLG" for Shavitz Law Group, P.A. Because the firms representing Plaintiffs have acted in concert, all are presumably tainted by misconduct undertaken by any of them. *See Garcia De Leon v. New York Univ.*, No. 21 Civ 05005 (CM), 2022 WL 2237452, at *16 (S.D.N.Y. June 22, 2022) (denying motion for class certification due to counsel's failure to notify court of participation of co-counsel, noting that "failure to disclose any of this renders both firms unfit to serve as class counsel").

[5] SLG's message to Llorentis stated SLG was contacting him "to inquire if [he] experienced the following: being paid a salary but misclassified as exempt from overtime … and/or being misclassified as exempt from overtime wages and paid only a set salary while in training." LinkedIn Message, attached as **Exhibit 2**.

to an individual lawsuit as a class action or a collective action. They will get an advertisement and think there is a lawsuit. That's all that's happening here. Our clients are using something they don't [know] anything about, unfortunately." Transcript of November 28, 2023 Hearing at 36:25-57:9, attached as **Exhibit 1**; *id.* at 39:17-20 ("[Llorentis] reads an ad and he hears that he may be able to assert a claim against MyEyeDr. He thinks that's a lawsuit. That's what lay people do, unfortunately."). SLG's contacts with other GMs, including Named Plaintiffs, were supposedly undertaken in the course of "investigating" Llorentis' claims; after SLG convinced Llorentis to join a lawsuit that did not yet exist, SLG contacted the Named Plaintiffs about an "investigation" into claims on behalf of some other, unidentified GM, leaving each Named Plaintiff to believe someone else was the first person to assert a claim against the Company. ECF No. 98 at 3-4. As a result of SLG's course of conduct, Named Plaintiffs have no understanding of what it means to be a class representative. *See, e.g.*, ECF No. 174-1, Transcript of the Deposition of Mary Alice Clark, "Clark Tr." 49:3-15 ("Q. Do you have any understanding of the obligations that go along with being a named plaintiff? A. Just representing for anybody else who is involved. Q. Beyond that, do you have any understanding? A. Not that I can verbalize."). Named Plaintiffs lack a comprehensive understanding of the claims they asserted and their alleged involvement in the case. *See, e.g.*, Clark Tr. 48:4-6 ("Q. Do you know if you reviewed [the Complaint] before it was filed in court? A. I don't know"); Clark Tr. 20:18-20 ("Q. You believe you haven't seen [Clark's Responses to Defendant's Discovery Requests], or you just don't know. A. I don't know."). The ignorance that SLG fomented in Named Plaintiffs regarding their role is independent grounds to deny class certification. *Scott v. New York City Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 356 (S.D.N.Y. 2004) ("[T]his Circuit, as well as many others, has frequently rejected class certification where the class representatives have so little knowledge of and involvement in

the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.") (internal citation and quotation omitted).

SLG violated the most basic ethical rules by misleading Llorentis and using him as the catalyst to recruit other potential clients as part of an "investigation." *See* Mass. R. Prof. C. 7.1, cmt. [2] ("A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. … Misleading statements, even if truthful, are prohibited.").[6] SLG's misleading solicitation bears directly on their adequacy as counsel for any class. *See Pilcher v. Direct Equity Lending*, Civ. No. 99–1245, 2000 WL 33170865, at *3 n.6 (D. Kan. Dec. 22, 2000) ("Actions by or on behalf of plaintiffs' counsel may be considered in the determination of class certification …. Procedural irregularities or improper communications to prospective class members are grounds for denying class certification."). Pursuant to Rule 23(g), this Court is required to "consider all matters which may be germane to whether or not proposed class counsel … are able to fairly and adequately protect the interests of the class," including the propriety of Plaintiffs' counsel's "litigation-related conduct." *Brown v. Tax Ease Lien Servicing, LLC*, No. 3:15-CV-208-CRS, 2017 WL 6939338, at *16 (W.D. Ky. Feb. 16, 2017) (quotation and citation omitted); *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 919 (7th Cir. 2011) (vacating class certification and ordering trial court "re-evaluate the gravity of class counsel's misconduct and its implications for the likelihood that class counsel will adequately represent the class"). These considerations are particularly acute because SLG has been sanctioned and disqualified for solicitation misconduct, suggesting the firm's misconduct here was no accident; indeed, it appears to be SLG's business model. *Hamm v. TBC Corp.*, 345 F. App'x 406, 408 (11th Cir. 2009)

---

[6] *See also* R. Regulating Fla. Bar 4-7.14 (prohibiting lawyers from engaging in any "potentially misleading advertisement," including those subject to "varying reasonable interpretations, 1 or more of which would be materially misleading when considered in the relevant context").

(affirming sanctions order against SLG based on prohibited solicitation). Moreover, SLG harassed at least one current GM involved in the matter, telling her that if she did not continue to participate, MyEyeDr. would fire her and pursue legal action against her. *See* **Exhibit 24**, Declaration of Angela Young at ¶ 6 ("I did not want to be a part of this case after receiving a harassing letter from one of the law firms. I believe I threw it away. It said I had to respond to them within 24 hours and that MyEyeDr. could or would sue me personally and frankly I never knew why. I believe it also threatened that MyEyeDr. might fire me."). The Court should deny class certification because SLG used a misleading solicitation to obtain their first client, for their own benefit, to then solicit others.

## III.   UNIFORM CLASSIFICATION DOES NOT WARRANT CLASS TREATMENT.

The overarching theme of Plaintiffs' Motion is that MyEyeDr.'s uniform classification of GMs as exempt is sufficient to render class certification appropriate. This approach ignores both the common sense reality that no large employer can make person-by-person exempt status classification decisions as to hundreds or thousands of individual workers, and the well-established law that a blanket exemption "is not itself determinative of the [class] certification inquiry," *Romero v. H.B. Auto. Grp., Inc.*, No. 11 Civ. 386 (CM), 2012 WL 1514810, at *18-20 (S.D.N.Y. May 1, 2012) (internal quotation omitted), as it "does not eliminate the need to make a factual determination as to whether class members are actually performing similar duties." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953 (9th Cir. 2009) (reversing class certification premised on uniform policy classifying employees as exempt because "courts must still ask where the individual employees actually spent their time") (citation omitted); *Dailey v. Groupon, Inc.*, No. 11 C 05685, 2014 WL 4379232, at *10 (N.D. Ill. Aug. 27, 2014) (denying class certification: "fact that an employer classifies all or most of a particular class of employees as exempt does not eliminate the need to make a factual determination as to whether class members

are *actually* performing similar duties") (citation omitted).[7],[8] The regulations implementing the FLSA categorically reject Plaintiffs' proposed approach. 29 C.F.R. § 541.2 ("A job title alone is insufficient to establish the exempt status of an employee. The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part."). Under Plaintiffs' view, the Court would have no choice but to certify a class in every misclassification case in which a certain job is uniformly classified as exempt. *See Colson v. Avneet, Inc.*, 687 F. Supp. 2d 914, 927 (D. Ariz. 2010) (if "mere classification of a group of employees … as exempt under the FLSA" was sufficient "district court would then somehow be required to order collective action notification"). To the contrary, misclassification cases require individualized, fact-specific inquiries. *See DaRosa v. Speedway LLC*, 557 F. Supp. 3d 315, 322 (D. Mass. 2021) (denying motion for Rule 23 class certification and FLSA conditional certification due to individual inquiries into the "specific circumstances of each [general manager]s] employment"); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 947 (9th Cir. 2009) (affirming denial of certification based on differences).

Here, Defendants argue that both the executive and administrative exemptions apply, requiring the Court to analyze each individual's duties and apply two distinct legal tests on a case-by-case basis. 29 C.F.R. § 541.700(a); *Rooney v. Town of Groton*, 577 F. Supp. 2d 513, 528 (D. Mass. 2008) (tests for administrative and executive exemptions differ); *Quiles v. Wal-Mart Stores,*

---

[7] The Court may rely on FLSA decisions in applying Massachusetts and Pennsylvania overtime laws. *See Cash v. Cycle Craft Co., Inc.*, 508 F.3d 680, 686 (1st Cir. 2007); *Szabo v. Muncy Indus., LLC*, No. 21-CV-468, 2023 WL 2472599, at *4 n.55 (M.D. Pa. Mar. 10, 2023) (FLSA and Pennsylvania law "essentially identical"); *Itterly v. Family Dollar Stores, Inc.*, No. 08–1266, 2014 WL 348638, at *2 (E.D. Pa. Jan. 30, 2014) (tests for exemptions under FLSA and Pennsylvania law "sufficiently similar").

[8] Even on conditional certification, where the burden is lower than Rule 23, courts regularly reject the idea that a blanket exemption is sufficient to establish collective treatment. *See, e.g.*, *McKnight v. Honeywell Safety Products USA, Inc.*, C.A. No. 16–132 S, 2017 WL 3447894, at *9 (D.R.I. Aug. 11, 2017); *Brown v. Barnes and Noble Inc.*, 252 F. Supp. 3d 255, 262 (S.D.N.Y. 2017).

*Inc.*, No. 16-9479, 2020 WL 1969940, at *5-6 (D.N.J. Apr. 24, 2020) (primary duty analysis is "fact intensive" and depends on "actual work performed by the proposed class members"). In attempting to foist controlling weight on a common job description and MyEyeDr.'s uniform classification of the GM role, Plaintiffs fail to appreciate how little of their jobs were addressed in those uniform materials. Plaintiffs admit the GM job description explicitly states "the office might vary based on scope and practice and other differences." (Motion at 6, ¶27). None of the policies or procedures Plaintiffs cite instruct the GMs to perform non-exempt work or specify how much time should be spent on each task – the essential questions at issue.[9] *See Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 948 (9th Cir. 2011) (noting documents did "not establish whether [plaintiffs] actually are 'primarily engaged' in exempt activities during the course of the workweek."); *McKnight*, 2017 WL 3447894, at *9 (job description may support collective certification only if it "sets out tasks that are primarily non-exempt").[10]

Not only does Plaintiffs' exclusive reliance on limited information in company documents ignore thousands of pages of testimony reflecting GMs' *actual* job duties, this approach directly

---

[9] That the job description provides that GMs should spend 90% of their time on the sales floor does not suggest they spent 90% of their time spending non-exempt tasks. Plaintiffs were expected to and did constantly perform management duties while on the sales floor. *See e.g.*, **Exhibit 3,** Transcript of Deposition of West "West Tr." 129:12-15 ("Q. If you were working with customers or patients, were you simultaneously supposed to be keeping an eye on the rest of the store? A. Absolutely."); ECF No. 168-2, Transcript of the Deposition of Jacob Galba-Bright "Galba-Bright Tr." 178:11-15 ("Q. So at all times when you were in your office, you were responsible for all that was going on? … A. Yes."). GMs are expected to be on the sales floor because that is where the employees they are charged with supervising work.

[10] *See also Sinouhui v. CEC Entm't, Inc.*, Case No. EDCV 14-2516-JLS (KKx), 2016 WL 3475321, at *4 (C.D. Cal. Mar. 16, 2016) ("The identified policies regarding [labor hour] targets and coverage do not require that General Managers spend a majority of their time performing non-exempt work, and whether any given restaurant was so understaffed that General Managers 'primarily engaged' in hourly tasks remains an individualized inquiry."); *Casida v. Sears Holdings Corp.*, 2012 WL 3260423, at *22 (E.D. Cal. Aug. 8, 2012) ("Though, the common policies provided by Plaintiffs here instruct them in how to perform certain tasks, they do not tell Plaintiffs how to balance their responsibilities and do not direct them to perform the tasks reserved for their associates and leads.") (citation omitted); *Colson*, 687 F. Supp. 2d 914, 928; *Hill v. R+L Carriers, Inc.*, 2011 WL 830546, at *9-10 (N.D. Cal. 2011) (denying class certification despite plaintiff's claim of uniform policies detailing job duties).

contravenes the underlying foundation of Plaintiffs' claims, which necessarily rest on a presumption that GMs did not perform the duties that MyEyeDr. prescribed in the documents they now cite. *See e.g.*, **Exhibit 4**, Deposition of Alexandra Miller "Miller Tr." 100:5-11 ("Q. Were you expected to come up with plans to increase revenue? A. Like I said, it's listed here on this [job description], but I never had a conversation about that being part of, you know, my duty.").[11] Plaintiffs cannot rely on MyEyeDr.'s alleged uniform expectations of its GMs to establish commonality of job duties, while simultaneously contending that they were not held to those expectations. *See Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 221 (D. Conn. 2003) (job description cannot justify class/collective certification where plaintiff "express[ly] disavows" it); *Freeman v. Sam's East Inc.,* Civ. No. 2:17-1786 (WJM), 2018 WL 5839857, at *3 (D.N.J. November 8, 2018) (plaintiff's claim that he spent most of his time performing non-managerial tasks "[did] not require the Court to infer that a significant number of other [individuals in the same role] would have also deviated from the written job description to spend most of their time performing non-managerial tasks")[12] (quotation omitted).

Plaintiffs' District Managers consistently testified that GMs were permitted to – and did – deviate from and adapt policies and procedures in order to address clinic needs. *See e.g.* **Exhibit 8**, Deposition of Eric Corban "Corbin Tr." 141:3-9 ("Q. [R]egardless of product offerings, the store is operated in a similar manner, right? … A. I think each district and each region, there's specifics

---

[11] *See also* **Exhibit 5**, Deposition of Lule Baftiri "Baftiri Tr." 47:24-48:4 ("Q. So the second bullet point [listed on job description] says 'Ensure staffing guidelines and controls are met.' Is that something you did at MyEyeDr.? A. We were not able to set staffing guidelines at MyEyeDr."); **Exhibit 6,** Deposition of Eduardo Llorentis "Llorentis Tr." 80:18-23 ("Q. So you received training from MyEyeDr. on how to manage a team? A. Yeah. Q. But it's your testimony that you were not expected to manage your team? A. That wasn't the culture, no."); **Exhibit 7**, Deposition of Heather Smith "Smith Tr." 123:11-124:7 ("Q. And you were expected to monitor their performance and possibly identify areas for improvement? A. Yes, but it often didn't work out that way. Q. Why not? A. Because I'd be working on the floor.").
[12] *See also* Clark Tr. 20:18-20 ("Q. You believe you haven't seen [Clark's Responses to Defendant's Discovery Requests], or you just don't know. A. I don't know.")

that are not what I would call cookie cutter. It's not all the exact same across the board now."); 73:24-25 ("I did not use the district manager quarterly audit sheet.").[13] Existence of uniform policies and categorical classification of GMs as exempt cannot substantiate certification of a class in the face of evidence that policies were not uniformly followed or enforced.

Plaintiffs rely heavily on *Prinzo v. Hannaford Bros. Co., LLC*, 343 F.R.D. 250, 252-53 (D. Mass. 2023) and *Lyons v. Citizens Financial Group, Inc.*, Civil Action No. 11–11187–GAO, 2012 WL 5499878, at *2 (D. Mass. Nov. 9, 2012) to justify class treatment, but each is easily distinguishable. First, *Prinzo* was based on discovery pertaining to a single plaintiff, (343 F.R.D. at 252 and related docket), and *Lyons* was decided prior to *any* discovery. 2012 WL 5499878, at *2 (describing parties' supporting affidavits as "largely conclusory and not of much value"). Neither court had the benefit of the extensive discovery taken, with depositions of 32 Plaintiffs and 8 managers, all summarized in cross-motions for summary judgment, demonstrating the parties' reliance on individualized proof. Here, the Court cannot ignore the significant factual differences among GMs that far surpass any commonalities that may be inferred from uniform policies. *Swank v. Wal-Mart Stores, Inc.*, No. 2:13-cv-1185, 2018 WL 2684102, at *5-6 (W.D. Pa. June 5, 2018) ("Without a common narrative in the record as to what the AMs actually did on a day-to-day basis, this Court cannot extrapolate the primary duty of all AMs in Pennsylvania on a class-wide basis," referencing varied accounts of job duties in declarations).[14] Finally, in *Prinzo*,

---

[13] *See also* **Exhibit 9**, Deposition of Frank Mesa "Mesa Tr." 125:16-18 ("Q. Was it your expectation that new GMs in your district would read the [Standard Operating Procedures] cover to cover? A. No."); 59:3-5 ("Q. Were the stores, though, expected to complete the practice success checklist? A. Not in my district."); **Exhibit 10**, Deposition of Frank Quarshie "Quarshie Tr." 132:17-21 ("Q. Do general managers have flexibility to adapt their practices when it comes to implementing [Standard Operating Procedures]? A. Yes."); 133:18-20 (confirming GMs adapt procedures to help promote clinic profitability); 135:14-22 (estimating GMs exceed labor hours budgeted for clinics without approval 20 to 30 percent of time).

[14] *See also Rea v. Michaels Stores, Inc*., No. SACV 13–455–GW(AGRx), 2014 WL 1921754, at *4 (C.D. Cal. May 8, 2014) (fact-specific analyses of store managers' exempt status would "swamp the common issues of fact"); *Chavira v. OS Rest. Servs., LLC*, Civil Action No. 18-cv-10029-ADB, 2019 WL 4769101,

the court noted that the defendant was "virtually conceding numerosity, typicality, adequacy, and superiority." *Prinzo*, 343 F.R.D. at 251. No similar concession has been made here.

A much more illuminating analysis is applied in *DaRosa v. Speedway LLC*, 557 F. Supp. 3d 315 (D. Mass. 2021), in which the court declined to certify a class of retail store general managers due to "the representatives' disparate testimony that on an individual basis they undertook and exercised varying degrees of responsibility and authority in the management of their Speedway stores …" *Id.* at 322. Specifically, the plaintiffs' own testimony established variations in store staffing; authority to hire, fire, or discipline; extent of training and feedback provided to subordinates; responsibility to address customer complaints; and level and frequency of oversight by district managers. *Id.* at 318, 322–23 ("[C]ourt cannot conclude that there is a consistent answer to the question whether the 1,268 opt-in plaintiffs were properly classified as exempt employees.") (citation omitted). The *DaRosa* court explained that questions are common for purposes of Rule 23 if they can be answered "'yes' or 'no' for the entire class." *Id.* (quoting *Walker v. Osterman Propane LLC*, 411 F. Supp. 3d 100, 108 (D. Mass. 2019)).

Here, as in *DaRosa*, a uniform job description and the employer's classification of the role as exempt do almost nothing to inform the questions raised, and the Court should decline Plaintiffs' invitation to shortcut the detailed factual analysis that Rule 23 requires in favor of a glib reference to MyEyeDr.'s consistent treatment of a role staffed by hundreds of incumbents. *Id.*

## IV.    PLAINTIFFS CANNOT ESTABLISH COMMONALITY.

"What matters to class certification ... is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the

---

at *1 (D. Mass. 2019) (refusing to certify FLSA collective on "basis of one named plaintiff's affidavit, without supporting documentation relevant to Massachusetts locations").

potential to impede the generation of common answers." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) (internal quotation omitted); *In re Wells Fargo Home Mortg. Pay Litig.*, 511 F.3d at 959; *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1229 (10th Cir. 2013) (affirming denial of class certification, noting "highly individualized facts and circumstances"). Put simply, "[t]he common questions must be dispositive and overshadow other issues." *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001) (citation omitted); *DaRos*a, 557 F. Supp. 3d at 323 ("[Q]uestions are common if they can each be answered either 'yes' or 'no' for the entire class and the answers will not vary by individual class member.") (citation and internal quotations omitted).[15]

## A.    Whether GMs Worked Any Overtime

As a threshold matter, there is evidence some GMs never worked more than forty hours per week, and thus have no entitlement to overtime, regardless of exempt status. *See* **Exhibit 11**, Deposition of Jamie Janik "Janik Tr." 96:3-17 ("Q. [Plaintiff Berry] may not have even been working 40 hours a week? A. That's correct. … Q. How about Kristin [Bowles]…? A. I also received information from the doctor and the staff that she never worked a 40-hour week."); 100:15-24 (Plaintiff Martin did not work more than 40 hours).[16] This is not a mere damages

---

[15] Plaintiffs cannot establish typicality for the same reasons. The two inquiries are fundamentally intertwined because "[both] serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Schonton v. MPA Granada Highlands LLC*, Case No.: 16-cv-12151-DJC, 2019 WL 1455197, at *8 (D. Mass. Apr. 2, 2019) (quoting *Dukes*, 564 U.S. at 349 n. 5); *see also In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 19 (1st Cir. 2008) ("[T]here is some overlap among the certification criteria of commonality, Rule 23(a)(2), typicality, Rule 23(a)(3), and predominance, Rule 23(b)(3)."). Extensive factual differences reveal there is no such thing as a "typical" GM, precluding commonality or typicality. *Barry v. Moran*, Civil Action No. 05–10528–RCL, 2008 WL 7526753, at *11 (D. Mass. May 7, 2008) (denying class certification).

[16] Plaintiffs' estimates of their working hours range greatly. Baftiri Tr. 131:1-3 (45 hours per week); **Exhibit 12**, Deposition of Julie Bartik "Bartik Tr." 136:21-23 (55 hours); Clark 189:21-190:1 (45 to 57, averaging 50 ); **Exhibit 13**, Deposition of Amy Davern "Davern Tr." 144:2-3 (60 to 65 hours); **Exhibit 14**, Deposition of Linda Gilroy "Gilroy Tr. 94:20-95:1 (50 to 55 hours). Some Plaintiffs received expectations of hours they would work as GMs. *See e.g.*, Cardona Tr. 33:20-34:14 (advised during interview he would be expected to work 40 to 45 hours per week). Others did not. *See, e.g.*, **Exhibit 15,** Deposition of Christopher

question but goes to liability because, if a GM did not work more than forty hours in any week, the GM will have no claim. *Crowe v. Examworks, Inc.*, 136 F. Supp. 3d 16, 50 (D. Mass 2015) (hours actually worked "go directly to questions of liability.") (quote omitted). There are no records of the hours that GMs worked,[17] and thus the jury would need to undertake individualized factfinding on whether each class member worked any overtime, even if their duties were not in dispute, which is antithetical to considerations of judicial economy that underlie commonality.

### B.    Job Duties Among GMs Varied Significantly.

Plaintiffs' own testimony elucidates the varying degrees of responsibility and authority GMs exercised.[18] *Compare* Clark Tr. 210:1-4 ("Q. [Y]ou believe that the company told you that it expected you to act as the CEO of your own clinic? A. Yes."); Smith Tr. 74:18-22 ("[Q] Did you understand that MyEyeDr wanted you to be a leader in your office? A. Yes. MyEyeDr did want me to be a general manager in the office, yes.") *with* Baftiri Tr. 82:6-8 ("Q. Did you understand that MyEyeDr. wanted you to take ownership of your office? A. We never talked about it."); Gilroy Tr. 40:17-21 ("Q. If a decision needed to be made in your office were you ultimately responsible? A. No. Q. Who was? A. [District Manager] Brian.").[19] Plaintiffs varied considerably in their prior

---

Coulter "Coulter Tr." 54:14-16 ("Q. Do you remember anything at all about the hours you would work? A. I do not.").

[17] *See, e.g.*, Galba-Bright Tr. 158:19-21 (confirming no record of hours); ECF No. 168-3, Transcript of the Deposition of Armando Cardona "Cardona Tr." 143:4-6 (same); Clark Tr. 186:23-187:1 (same).

[18] The Court may consider record evidence pertaining to Plaintiffs in any state. Plaintiffs' theory is based on the premise that GMs across the country are the same. Pls.' Mot. for Conditional Certification 11-15, (ECF No. 20) at 5, 10. The record evidence reflects stark differences even between GMs in the same state. For instance, Massachusetts Plaintiffs Clark, Coulter, and West described material differences in their recruitment and hiring authority. *See* Clark Tr. 139:4-143:12 (conducted interviews and made hiring recommendations her DM followed); Coulter Tr. 87:22-88:2 (not allowed to recruit); West Tr. 134:1-8 (denies recommendations). Similarly, Pennsylvania Plaintiff Nelson insisted his DM instructed him on exactly what ratings and narrative to include in performance reviews, to the point Nelson was merely parroting his DM, whereas Pennsylvania Plaintiff Smith described autonomy over evaluating her team. **Exhibit 16**, Deposition of Kevin Nelson "Nelson Tr." 124:1-22; 136:17-23; Smith Tr. 124:12-23.

[19] Plaintiffs admit they did not know what daily tasks or responsibilities GMs at other locations performed. Clark Tr. 199:18-22; Cardona Tr. 144:6-10; Galba-Bright Tr. 139:11-18; ECF No. 178-2, Transcript of the Deposition of Jamshid Firouzi "Firouzi Tr." 150:6-11.

managerial work experience;[20] the number of employees they supervised; their authority to hire, fire, and discipline employees; the extent of entrepreneurial activity; the level of oversight by DMs; the number of hours worked; and whether and to what extent the COVID pandemic impacted their job duties, and there is no way for the Court to draw classwide conclusions.

### 1. Supervising, Coaching, Training, and Evaluating Associates

Supervising subordinate employees is a hallmark of the executive exemption. 29 C.F.R. 541.102 (enumerating "directing the work of employees" and "apportioning the work among the employees" in definition of "management" duties for executive exemption). Plaintiffs' testimony reveals significant variation in the number of associates they supervised, ranging from as few as three to as many as eighteen. Clark Tr. 108:2-7 ("Q. [T]he idea behind the structure of your store is you would be supervising a staff that included three positions? A. Three to four"); **Exhibit 17**, Deposition of Milton McCall "McCall Tr." 156:13-15 (up to 5 associates); Galba-Bright Tr. 75:21-22 (peak of 15 hourly associates); **Exhibit 18**, Deposition of Shane Frye "Frye Tr." 35:4-11 (18 hourly associates).[21] In contrast, some GMs testified that they were frequently the only person in the clinic. *See e.g.,* West Tr. 60:20-61:2 (alone in the clinic "majority" of time). The core of the executive exemption is supervision of subordinates, and the Court cannot draw conclusions about the importance or demands of that duty as to a class because Plaintiffs' testimony varied widely.

In this same vein, some GMs took seriously their duty to hold associates accountable for performance and conduct, provided consistent feedback and coaching to their employees, developed plans to improve associate underperformance, and held frequent meetings to set goals

---

[20] For example, Firouzi established and ran two optical practices, where he hired, trained, and managed. Firouzi Tr. 24:7-9; 53:5-8; *see also* Coulter Tr. 94:10-12 (had vast experience managing). Others started in other capacities and had no experience. Cardona Tr. 19:5-20:6; 21:1-12; 23:14-18.

[21] Janik Tr. 93:8-22 ("Q. GM for higher volume store would thus have more people to supervise, correct? A. Correct. Q. And that could have a very significant impact on the GM's job, correct? A. Correct.")

and provide encouragement. Galba-Bright Tr. 90:14-21; 60:10-13 ("Q. So was part of your responsibility as a general manager coaching your associates in your store? A. Yes"); Nelson Tr. 162:18-22 ("[A.] For anybody; and didn't matter who it was. It could have been a district manager in the office. It could have been anybody. If somebody is behaving inappropriately, I would let them know, you need to stop what you're doing there."). Others denied having any such authority or responsibility. Smith Tr. 108:10-13 ("I couldn't really hold them accountable."); Gilroy Tr. 39:16-22 ("We worked as a team together."); Coulter Tr. 147:2-3.[22]

While some Plaintiffs testified they actively monitored their clinics at all times, regardless of whether answering phones or working with patients, other Plaintiffs testified they were too busy with other tasks to observe staff. *Compare* Cardona Tr. 101:21-102:1 ("[Q]. [I]f you're at the front desk and you're doing something else, but you observe a patient interaction that you think may not result in a good patient experience, will you address that with the team member? A. 100 percent.") and Corbin Tr. 153:15-154:5 (admitting that, as GM, he manages and engages in sales tasks simultaneously and sales do not distract from management) *with* Smith Tr. 123:11-18.

## 2. Disciplining Associates

Disciplining subordinates is another recognized emblem of executive status. 29 C.F.R. § 541.102 ("management" includes "disciplining employees"). Plaintiffs' authority to discipline, and the extent to which they did so, ranged broadly. Some admitted they had authority to address employee misconduct, and exercised such authority by issuing warnings and having disciplinary conversations with employees. West Tr. 107:12-108:18 (GM removed sales associate from floor and sent her home because being rude to customers); Smith Tr. 125:4-11 ("I document, I would

---

[22] Some Plaintiffs had authority to send their associates to other clinics that needed assistance, while others required DM approval to do so. *Compare* McCall Tr. 73:13-21 ("Do you have authority to send associates in your office to another clinic if they're needed there? If my office doesn't need them and I can, yes.") *with* **Exhibit 19**, Transcript of Deposition of Farnham 120:22-23 ("I can't transfer anybody.").

talk with them and then I would have to partner with HR and the DM."); Cardona Tr. 130:1-5 (GM undertook associate write-ups without assistance from DM). Other Plaintiffs denied having authority to address misconduct. *See e.g.,* Nelson Tr. 153:4-10; Llorentis Tr. 102:17-103:1.

### 3. Hiring and Firing Associates

Hiring and firing of subordinates is another signature trait of exempt executives. 29 C.F.R. § 541.100(a)(4). Plaintiffs varied widely in their authority to hire and fire. Plaintiff Coulter was almost entirely uninvolved with recruiting, testifying that he lacked authority to recruit and was never asked to do so by his DM (Coulter Tr. 87:22-88:10), and Miller never conducted an interview because no one was hired. Miller Tr. 55:24-56:10. Meanwhile, Cardona is actively involved in the recruiting process for his clinic and independently interviewed and hired three employees, without involving his DM. Cardona Tr. 107:11-108:13; 109:24-110:1. Similarly, some Plaintiffs testified they had no authority to fire employees (Farnham Tr. 120:21-23), while others made unilateral decisions to terminate employees (Cardona Tr. 124:21-125:11) or were otherwise involved in employee terminations. **Exhibit 20**, Deposition of Joshua Mitchell "Mitchell Tr." 198:12-15.

### 4. Managing Clinic Financials

Another key duty of exempt executives is financial oversight of the department or location they manage. 29 C.F.R. § 541.102. Plaintiffs' involvement in and responsibility over the financial performance of their clinics was far from uniform, even among those located in the same state. Plaintiff Clark was asked to provide her opinions to set the budget for her clinic, (Clark Tr. 158:23), while Plaintiff Nelson stated that he was never consulted regarding the budget for his clinic. Nelson Tr. 94:14-22; *see also* Baftiri Tr. 35:23-36:2 ("A. I did look at the sales goals that were set by MyEyeDr., the performance goals that they set, and I did monitor them."); Llorentis Tr. 94:8-11.[23]

---

[23] Several Plaintiffs developed ways to improve performance of their clinics. For example, Plaintiff Smith described using medical coding as a creative way to improve revenue. Smith Tr. 169:1-15. Plaintiff Cardona

Some Plaintiffs were tasked with presenting and discussing financial metrics for their clinic (*see e.g.,* Cardona Tr. 53:13-54:8) while others denied doing so (*see, e.g.*, Davern Tr. 135:23-136:3).

### 5. Level of DM Oversight

Plaintiffs operated their clinics with varying levels of independence from their DMs. Some Plaintiffs had limited interaction with their DMs, while others met with DMs regularly. *Compare* Farnham Tr. 154:24-155:11 (communicated with DMs two to three times a day); *with* Davern Tr. 45:10-12 ("Q. And then did you have regularly scheduled phone or Teams calls with [DM] Michelle just one-on-one? A. No."). Some Plaintiffs operated for a period of months with no DM oversight. Cardona Tr. 13:21-25; 56:18-57:1 (explaining he "didn't get any kind of communication" from the DM who was technically assigned to his location during a two to three month gap). And some Plaintiffs experienced both strict and lax oversight *in the same clinic*, when a DM was replaced. *See e.g.*, Smith Tr. 136:24-137:12; 139:19-140:1 (one DM visited her clinic once or twice a year while another DM visited at least once a month).

### 6. Impact of COVID

The COVID pandemic had a material impact on the duties of some GMs, while others were not employed during that period of time. *See e.g.,* Clark Tr. 197:16-198:4 ("Q. The entire period of time that you worked for the company was during a pretty heightened period of the COVID pandemic; right? [...] A. Correct."); Smith Tr. 63:11-17; Gilroy Tr. 110:20-24 (did not return from COVID furlough). Those who worked through COVID experienced unprecedented, temporary changes to their duties, including a period of time when all clinics were closed entirely, followed

---

coached his employees not to place perceived limits on amounts patient is willing/able to spend. Cardona Tr. 117:24-118:9 ("I used the [] phrase, 'Don't shop with your own pocket"). Plaintiffs engaged in self-driven entrepreneurial, marketing and recruitment efforts. McCall Tr. 69:13-21, **Exhibit 21**, Deposition of Ronald Hedges 122:22-123:11, Galba-Bright Tr. 123:6-14; *see also* Corbin Tr. 156:12-23 (explaining that as GM, he went to local community events to attract new patients).

by a gradual reopening and restaffing of the clinics based on market conditions.[24] Many GMs took on extra tasks or placed less emphasis on their managerial tasks during this time of crisis. *See, e.g.*, **Exhibit 22**, Deposition of Phillip Roscher "Roscher Tr." 83:3-5 ("We all have to know how to do everything."); Smith Tr. 21:18-21 ("I was at the office by myself doing everybody's role."). The law recognizes that such emergencies and changes in job duties necessary to manage them do not impact an otherwise exempt employee's status. 29 C.F.R. § 541.706(a); *Crayton v. Sailormen, Inc.*, No. 2:22-CV-4, 2023 WL 4706168, at *5 (S.D. Ga. July 24, 2023) ("COVID-19 pandemic, as the DOL guidance indicates, fits within 29 C.F.R. Section 541.706's definition of an 'emergency.'") (citation omitted). Plaintiffs' allegations about their routine job duties and limited executive authority must be placed in time and assessed as to whether any limits on their authority fall within the FLSA's emergency exception, which will pose yet another individual dimension.

### C.   Whether GMs Supervised at Least Two Subordinates Varied.

Plaintiffs notably omit from their motion one glaring difference among GMs, which they rely on in support of their motion for partial summary judgment: Plaintiffs argue *some of them* did not customarily and regularly direct the work of two full-time employees. *See* Plaintiffs' MSJ, ECF No. 180 at 15-16. Plaintiffs rely on an ostensible expert who purportedly analyzed payroll data. *Id.* Defendant has many reasons to reject Plaintiffs' argument, which Defendant reserves for its opposition.[25] For purposes of this motion, Plaintiffs' expert analysis reflects significant *variation* among GMs. *See* Plaintiff's MSJ, ECF No. 180 at 16, n. 11 ("15 of the 59 discovery plaintiffs" did not supervise 2+ "in 80% of their workweeks," and "27 out of 59 Plaintiffs (45%) potentially directed the work of two or more full-time employees in more than 80%.").

---

[24] Defendant's Statement of Undisputed Facts Plaintiff Clark (ECF No. 174) ("Clark Facts") at ¶¶ 54-61.
[25] For example, Plaintiffs ignore their own testimony about how many associates they supervised, and their expert did not consider or delineate time periods impacted by COVID.

### D.       Whether Plaintiffs' Salary Was Reduced for Partial Day Absences

Plaintiffs suggest that because Defendant allegedly took partial-day deductions from the salaries of *some* GMs, the exempt status of *all* GMs is abrogated.[26] *See* ECF No. 165 at 8 ("MyEyeDr. took partial day deductions from the salaries of GMs who joined the collective action during a six-year period from 2017 to 2023'"); ECF No. 180, at 15-19 (same). Despite alleging the deductions were done as a "systemic process,"[27] Plaintiffs fail to note that *none* of the four deposed Massachusetts or three Pennsylvania Plaintiffs was subject to a partial day deduction. To decide the liability question posed, the Court must determine for each: (1) whether any partial day deduction was made; (2) whether it was improper; and (3) if so, whether it compromised the Plaintiff's exempt status. 29 C.F.R. § 541.603.[28] The only uniform fact is that Defendant had a written policy prohibiting improper deductions. Clark Facts (ECF No. 174), at ¶ 49. Such "factual differences and localized practices…undermine[] Plaintiffs' arguments that the Court can resolve the salary issue with a common inquiry." *Strait v. Belcan Eng'g, Grp., Inc.*, 911 F. Supp. 2d 709, 728 (N.D. Ill. 2012); *see also O'Donnell v. Robert Half Int'l., Inc.*, 534 F. Supp. 2d 173, 184 (D. Mass. 2008) (denying class certification of salary basis claim due to individualized questions of whether each class member was subject to salary deductions and the practices of managers).[29]

---

[26] Plaintiffs' theory of this case is a moving target. Plaintiffs moved for conditional certification on the "primary duty" test. ECF No. 20, at 13, 15. The record evidence revealed the futility, and Plaintiffs now focus on whether GMs satisfy the salary basis test or directed two full-time employees. ECF No. 80, at 10-14.

[27] Plaintiffs' counsel asked Payroll Manager Jacobs whether the company used "systemic process…for processing salaried unpaid time off that was less than eight hours." Plaintiffs fail to include testimony whereby Jacobs rejected that: "It was not the intention of the utilization of that code," and confirming "standard process is to pay everybody what they're owed." **Exhibit 23**, Deposition of Jacobs 94:3-12.

[28] *See* Plaintiffs' MSJ (ECF No. 180) at 12 (quoting 29 C.F.R. § 541.603).

[29] In addition to the factual differences described above, Plaintiffs Clark and Coulter are subject to a unique defense that would not apply to other Massachusetts class members who did not train during the period. Massachusetts law exempts "qualified trainees" for bona fide executive and administrative roles. *See* M.G.L. ch. 151, § 1A(3); *Quazi v. Barnstable County*, 877 N.E.2d 273, 277 (Mass. App. Ct. 2007).

## V.      COMMON ISSUES DO NOT PREDOMINATE

Critical to Rule 23's commonality and predominance requirements is the notion that the key issues in the case must be susceptible to common or representative proof. *Romulos v. CVS Pharm., Inc.*, 321 F.R.D. 464, 471 (D. Mass. 2017) (Zobel, J.) (noting relationship between commonality and predominance). The Supreme Court has cautioned that Rule 23's commonality requirements are easy to misconstrue because *"any competently crafted class complaint literally raises common questions."* *Dukes,* 564 U.S. at 350 (quotation omitted). What matters, however, is whether a question will generate a common answer capable of resolving classwide liability. *Id*. If representative proof cannot generate a classwide answer, then the goal of efficiency underlying the Rule 23 procedural mechanism is frustrated, and the case would devolve into a series of mini-trials, causing jury confusion. The test for predominance is "far more demanding." *Amchem Prods. v. Windsor*, 521 U.S. 591, 624 (1997). Here, Plaintiffs have identified at most two ostensibly common issues:  GMs were subject to common written policies and GMs were classified as exempt. Those two issues are largely undisputed and will require little time and attention at trial. Indeed, those points are of marginal relevance in the exempt inquiry. *See Quiles v. Wal-Mart Stores, Inc.*, Civil Action No. 16-9479, 2020 WL 1969940, at *5 (D.N.J. Apr. 24, 2020) ("Corporate policies and job descriptions by themselves, however, are not determinative of exemption status.") (citation omitted). In vivid contrast, Defendants have identified a multitude of issues that bear directly on GM exempt status, are not subject to proof by reference to documents that apply classwide, and will require testimony about each GM. Highly individualized, fact intensive inquiries will consume the trial and overwhelm common issues. *See Cruz v. Dollar Tree Stores, Inc.*, Nos. 07–2050 SC, 07–4012 SC, 2011 WL 2682967, at *4 (N.D. Cal. July 8, 2011).[30]

---

[30] *Morrison v. Ocean State Jobbers, Inc.,* Civil No. 3:09CV1285(AWT), 2013 WL 1189682, at *12 (D. Conn. March 22, 2013) (denying certification because "examination of the plaintiffs' 'actual duties'

## CONCLUSION

Defendant asks the Court to deny the Motion and rule that this case will proceed as to the individual claims of the Named Plaintiffs only.

Dated: March 14, 2024

Respectfully Submitted,

DEFENDANT CAPITAL VISION SERVICES,
LLC d/b/a MYEYEDR.,
By Its Attorneys:

*/s/Hillary J. Massey*
Barry J. Miller (BBO# 661596)
bmiller@seyfarth.com
Hillary J. Massey (BBO 669600)
hmassey@seyfarth.com
Abigail D. Skinner (BBO # 709705)
askinner@seyfarth.com
Molly C. Mooney (BBO # 687812)
mmooney@seyfarth.com
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 1200
Boston, MA 02210-2028
Telephone: (617) 946-4800
Facsimile: (617) 946-4801

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2024, a copy of the foregoing document was filed through the Court's CM/ECF system, which will send notice of this filing to all counsel of record.

*/s/Hillary J. Massey*
Hillary J. Massey

---

demonstrates great variations"); *Hendricks v. J.P. Morgan Chase Bank, N.A.*, 263 F.R.D. 78, 89-90 (D. Conn. 2009) (denying certification because employees performed variety of duties, and factual questions could not be achieved through generalized proof).